IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Nikki Carson, | Civil Action No. 8:15-cv-04667-MGL-JDA |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Anderson County Sheriff's Office, | |
| Defendant. | |

This matter is before the Court on Defendant's motion for summary judgment. [Doc. 25.] Plaintiff alleges a retaliation claim pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII").[1] Pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(A) and Local Civil Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Plaintiff filed this action on November 19, 2015. [Doc. 1.] On December 2, 2016, Defendant filed a motion for summary judgment. [Doc. 25.] Plaintiff filed a response in opposition on December 22, 2016 [Doc. 31], and Defendant filed a reply on January 13, 2017 [Doc. 32]. Accordingly, the motion for summary judgment is ripe for review.

## BACKGROUND

**Overview of Plaintiff's Employment with Defendant**

Plaintiff began working as an investigator in Defendant's sex crimes unit in 2005. [Doc. 31-1 at 4:12–24.] After about one-and-one-half to two years, she was promoted to administrative lieutenant with the detention division. [*Id.* at 5:1–7.] When John Skipper

---

[1]Plaintiff initially alleged a claim for race and sex discrimination under Title VII as well. [Doc. 1 ¶¶ 27–30.] However, that claim was dismissed pursuant to a stipulation of dismissal filed on November 10, 2016. [Doc. 20.]

("Skipper") was elected as Sheriff in 2008, Plaintiff was transferred to the lieutenant position over school resource officers. [*Id.* at 5:19–6:8.] She remained in that position until she was demoted to background investigator in 2014. [*Id.* at 8:10–20.]

**June 2014 Events**

On Thursday, June 5, 2014, Plaintiff had a disagreement with her 16-year-old daughter because her daughter had been communicating with a gentleman ("Josh") who was 24-years-old and was possibly involved with a gang and criminal activity. [*Id.* at 9:19–10:14; *see also* Doc. 1 ¶ 11 (providing date).] Plaintiff and her husband forbade her daughter from having any contact with Josh. [Doc. 31-1 at 10:5–6.] After the disagreement, Plaintiff's daughter went in her room and out the window; Plaintiff realized her daughter had gone out the window five or ten minutes later. [*Id.* at 10:7–25.]

Early Friday morning, Plaintiff contacted Sergeant Tyrone Williams ("Williams"), a sergeant in her division, and advised him that she would not be at work. [*Id.* at 11:25–12:6.] Sometime between 9:00 a.m. and 10:00 a.m. that morning, Plaintiff contacted Captain Garland Major ("Major"), who was captain of investigations, and asked him to meet to give Plaintiff and her husband some direction.[2] [*Id.* at 12:6–18.] Major informed Plaintiff that they would need to file an incident report, and Plaintiff told Major to do whatever he needed to do. [*Id.* at 13:5–11.]

On Sunday, June 8, 2014, Plaintiff and some of her family and friends handed out flyers at an apartment complex where Josh's mom lived. [*Id.* at 17:10–18.] The flyers had Plaintiff's daughter's picture, Josh's picture, and a picture of Josh's car. [*Id.*] While Plaintiff

---

[2]Plaintiff did not contact her captain, Captain Brookshire ("Brookshire"), because he was off that day on vacation. [Doc. 31-1 at 12:9–15, 23:12–15.]

and her family and friends were at the apartment complex, Chief Carl Anderson ("Anderson") arrived at the apartment complex to see if he could talk to Josh's parents. [Doc. 31-3 at 2:21–25.] When he arrived, he saw people passing out flyers, and he spoke with Shanika Simpson ("Simpson"), a deputy who is also Plaintiff's cousin. [*Id.* at 3:4–18.] Anderson told Simpson that the family needed to back off and let Defendant handle the investigation. [*Id.* at 3:20–23.]

Next, Anderson spoke with Plaintiff. The details of that conversation are disputed. Plaintiff testified that she told Anderson, "Chief, I haven't seen my daughter in three days, I haven't eaten or slept in three days, I don't know where my daughter is, I don't know what to do, nobody is telling me what to do, I can't just not do anything, but I assure you that we're not out here violating any polices or procedures." [Doc. 31-1 at 19:22–20:4.] Plaintiff further testified that she understood Anderson had told Simpson something about not being out there but that Anderson never told Plaintiff to back off or go home. [*Id.* at 20:19–21:7.] Anderson, however, testified that he told Plaintiff she needed to back off after she stated in a hostile tone, "Chief, the only thing I'm concerned about now is my 16-year-old daughter, and if it interferes with my job, so be it, that's my concern right now." [Doc. 31-3 at 4:12–20.] Shanika testified that Plaintiff "just threw her hands up and said, 'I cannot just do anything, that's my daughter,' and she threw her hands up and she got back in the car." [Doc. 31-2 at 2:8–12.] Following her conversation with Anderson, Plaintiff got in her car and left the apartment complex. [Docs. 31-1 at 21:8–11; 31-2 at 2:11–16; 31-3 at 4:23–25.]

Plaintiff's daughter returned home later that evening, and Plaintiff spent the rest of the night at the hospital with her daughter. [Doc. 31-1 at 22:20–21.] Around 7:00 a.m. or 7:30 a.m. on Monday, June 9, 2014, Plaintiff sent a text message to Major to let him know

3

she was leaving the hospital. [*Id.* at 22:16–23.] Major replied, telling Plaintiff to go home and get some rest. [*Id.* at 22:23–24.] That afternoon, Plaintiff contacted Anderson to give him an update about her daughter, and Anderson informed Plaintiff that he had already talked with Major. [*Id.* at 23:22–24:1.] Plaintiff told Anderson that she would be in with her daughter the following morning for an appointment with Major. [*Id.* at 24:1–4.]

On Tuesday, June 10, 2014, Plaintiff returned to work and brought her daughter in to meet with Major. [*Id.* at 26:16–19.] Brookshire asked Plaintiff why she had not contacted him and told Plaintiff that Anderson was mad, so Plaintiff went to talk to Anderson. [*Id.* at 26:23–27:2.] Plaintiff explained to Anderson who she had contacted about missing work and when. [*Id.* at 27:4–28:1.] Anderson told Plaintiff that there was some concern about who Plaintiff notified about missing work and that his feelings were a little hurt because Plaintiff didn't tell Anderson about her daughter, but that he was not mad. [*Id.* at 28:10–23.] Instead, Anderson indicated at some point that Skipper was upset with Plaintiff. [*Id.* at 29:5–13.] Plaintiff suggested that they all sit down, and Anderson said he would arrange a meeting with Skipper. [*Id.* at 29:14–25.]

Plaintiff followed up with Anderson multiple times about arranging a meeting with Skipper. [*Id.* at 30:4–13, 31:1–21.] During one of these conversations, Anderson informed Plaintiff that he had talked to Skipper and that Skipper had said they would talk on Monday. [*Id.* at 31:19–21.] Plaintiff asked Anderson if she should call Skipper, and Anderson replied that they would talk on Monday. [*Id.* at 31:24–32:1.] Later that day, on June 21, 2014, Plaintiff called Skipper. [*Id.* at 32:2–21, 34:10–15.] Subsequently, she talked with Anderson again, who told her that Skipper had asked Anderson to call Plaintiff to let her

4

know that he got her phone call but that he was tied up so he would see her on Monday. [*Id.* at 34:16–35:5.]

During this second conversation with Anderson, Plaintiff asked Anderson why things seemed to be magnified or blown out of proportion in situations involving Plaintiff. [*Id.* at 35:10–18; Doc. 31-3 at 13:9–13.] Anderson's response is disputed. Plaintiff testified that Anderson responded, "Well, because you're black and because you're female, you have two strikes against you and I know it's not fair." [Doc. 31-1 at 35:18–21.] Anderson testified that he responded, "Well, you know, maybe you think it's because you got two strikes against you, because you're black and female." [Doc. 31-3 at 13:17–20.] Additionally, during one of the conversations on June 21, 2014, Plaintiff asked whether she was going to be terminated, and Anderson told her he did not think so. [*Id.* at 9:14–20.]

On Monday morning, June 23, 2014, Plaintiff relayed the two-strikes comment to Brookshire. [Docs. 31-7 at 2:12–3:3; 31-1 at 37:2–4.] Brookshire immediately stopped the meeting and notified Skipper because Plaintiff had characterized the issue as possible race and sex discrimination. [Doc. 31-7 at 4:16–5:4.] Plaintiff then repeated the comments to Skipper. [Docs. 31-1 at 37:13–17; 31-7 at 5:16–18.] Skipper subsequently asked Anderson about the comment, and Anderson responded that he had said it but it had been taken out of context. [Doc. 31-3 at 14:8–11.]

**The Decision to Demote Plaintiff**

When he met with Skipper to discuss options for disciplining Plaintiff, Anderson recommended that Plaintiff be terminated. [Docs. 31-3 at 11:9–11; 31-6 at 5:11–13.] Anderson testified that Brookshire and another captain, Darrell Hill ("Hill"), got involved and suggested that Plaintiff should be demoted instead of terminated, and Anderson indicated

5

he did not have a problem with demoting Plaintiff instead of terminating her. [Doc. 31-3 at 11:12–24.] Brookshire, however, testified that he recommended that Plaintiff be suspended and issued a written warning. [Docs. 31-7 at 6:3–7:3; 38-3 at 6:13–7:23.] On June 24, 2014, Plaintiff was notified that she was being demoted due to insubordination to Anderson, resulting in a change in salary from $58,713.92 to $38,000. [Doc. 31-6 at 9–10.]

## APPLICABLE LAW

**Summary Judgment Standard**

Rule 56 states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this

standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## **DISCUSSION**

Under Title VII, an employer is forbidden from taking action that discriminates against an employee because that employee has either "opposed any practice made an

7

unlawful employment practice by this subchapter" or has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[3] 42 U.S.C. § 2000e–3(a). The purpose of this antiretaliation provision is to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's most basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

A plaintiff may establish a violation of Title VII's antiretaliation provision either through direct and indirect evidence of retaliatory animus or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Under the burden-shifting framework, an employee must first prove a prima facie case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nonretaliatory reason for the adverse employment action. *Id.* By providing such an explanation, the employer rebuts the presumption of retaliation created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the employer articulates a legitimate,

---

[3]Through the two clauses of the antiretaliation provision, Title VII protects activities that "fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Here, Plaintiff alleges she engaged in opposition activity.

[4]Plaintiff relies exclusively on the *McDonnell Douglas* burden-shifting scheme in this case. [Doc. 31 at 12.]

nondiscriminatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for retaliation. *McDonnell Douglas*, 411 U.S. at 804.

**Prima Facie Case of Retaliation**

Defendant contends Plaintiff cannot establish a prima facie case of retaliation. [Doc. 25-1 at 8–13.] To establish a prima facie case of retaliation, the plaintiff must demonstrate "(1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)). For purposes of this motion, Defendant argues only that Plaintiff did not engage in protected opposition activity. [Doc. 25-1 at 8–13.] The Court disagrees.

Plaintiff alleges she engaged in protected activity when she reported Anderson's two-strikes comment. [Doc. 31 at 13–14.] Protected opposition activities include complaints about suspected violations of Title VII. *Bryant v. Aiken Reg. Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). Title VII "protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *E.E.O.C. v. Navy Fed'l Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (citations omitted). Moreover, "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (citations omitted).

"[T]he threshold for oppositional conduct is not onerous." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). Recently, the Fourth Circuit Court of Appeals expanded the scope of what may be considered a protected activity. In *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc), the court "made clear that [courts] should . . . interpret 'unlawful employment practice' broadly." *DeMasters*, 796 F.3d at 417 (citing *Boyer-Liberto*, 786 F.3d at 282)). As explained in *Boyer-Liberto*, the Supreme Court has held that "Title VII must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" *Boyer-Liberto*, 786 F.3d at 283 (quoting *Burlington N.*, 548 U.S. at 66–67) (alterations in *Boyer-Liberto*). Thus, the *DeMasters* court reversed the grant of summary judgment on a retaliation claim in part based on the district court's "myopic analysis" of the plaintiff's opposition as a series of discrete acts. *DeMasters*, 796 F.3d at 417. The court counseled,

> We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination," *Crawford [v. Metropolitan Gov't of Nashville and Davidson Cty., Tenn.*], 555 U.S. [271,] 276[ 2009]; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," *Boyer-Liberto*, 786 F.3d at 282.

*DeMasters*, 796 F.3d at 418 (emphasis in *DeMasters*) (alteration in *Crawford*).

Here, Plaintiff complained to Anderson that things seemed to be magnified or blown out of proportion in situations involving Plaintiff. Anderson responded, either stating affirmatively that it was because Plaintiff is black and female, thus having two strikes against her, or asking Plaintiff whether she thought it was because she is black and female, thus having two strikes against her. Two days later, Plaintiff reported Anderson's comments to Brookshire. Brookshire testified that he asked Plaintiff to repeat the conversation to Skipper because Plaintiff had characterized the issue as possible race and sex discrimination, therefore Brookshire needed to refer the matter to a supervisor. Examining the course of Plaintiff's conduct through a panoramic lens as instructed in *DeMasters*, the undersigned declines to find that Plaintiff did not engage in protected activity where Plaintiff reported employment actions that, at a minimum, she reasonably believed to be unlawful, and that Defendant should have understood to be opposing discriminatory conduct.

**Legitimate, Nonretaliatory Reason**

As Plaintiff has established a prima facie case, the burden shifts to Defendant to articulate a legitimate, nonretaliatory reason for demoting Plaintiff. Defendant has articulated that Plaintiff was demoted for the following reasons:

- Plaintiff's failure to report to work or notify a supervisor on June 6, 2014;

- The incident at the apartment complex on June 8, 2014;

- Plaintiff's failure to report to work or notify a supervisor on June 9, 2014;

- Plaintiff's contacting Anderson numerous times between June 10 and 21, 2014; and

- Plaintiff's contacting Skipper on June 21, 2014, after Anderson told her they would all meet on Monday, June 23, 2016.

[Doc. 25-1 at 14.] These explanations satisfy Defendant's burden under *McDonnell Douglas* to articulate a legitimate, nonretaliatory reason for demoting Plaintiff.

**Pretext**

Because Defendant has articulated a legitimate, nonretaliatory reason for demoting Plaintiff, the Court will consider whether Plaintiff has met her burden of demonstrating that Defendant's proffered reason is merely a pretext for retaliation, which would indicate whether Plaintiff could meet her ultimate burden of persuasion and demonstrate retaliation vel non. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) ("The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional [retaliation],' which at all times remains with the plaintiff." (first alteration in *Merritt*) (quoting *Burdine*, 450 U.S. at 256)). Generally, to prove an employer's articulated reason is a pretext for retaliation, a plaintiff "must prove 'both that the reason was false, and that [retaliation] was the real reason' for the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original) (quoting *St Mary's Honor Ctr.*, 509 U.S. at 515). However, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). Ultimately, to survive summary judgment, a plaintiff must demonstrate "a genuine dispute of material fact on the question of pretext sufficient to make [the employer's] proferred justification a triable issue." *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016).

The Court agrees with Plaintiff that the evidence in this case renders Defendant's reasons for demoting Plaintiff unworthy of credence. As an initial matter, the letter given to Plaintiff states insubordination as the single cause of demotion [Doc. 31-6 at 9], and the personnel action form states insubordination as the single reason for the demotion [*id.* at 10], yet Defendant now provides five reasons to support its decision to demote Plaintiff. With respect to Defendant's assertion that Plaintiff failed to report to work or notify a supervisor on June 6, 2014, and June 9, 2014, Plaintiff did not notify Brookshire that she would be absent from work because Brookshire was on vacation. [Doc. 31-1 at 12:9–15, 23:12–15.] However, Plaintiff notified Williams and met with Major on June 6, 2014 [*id.* at 11:25–12:18], and communicated with Major on June 9, 2014 [*id.* at 22:16–24]. With respect to Defendant's assertion regarding Plaintiff's behavior at the apartment complex on June 8, 2014, Simpson engaged in the same conduct as Plaintiff at the apartment complex but was not disciplined. [Doc. 31-3 at 5:1–6:4.] Moreover, Skipper testified that he did not know of anything Plaintiff did at the apartment complex to violate General Order 107 [Doc. 31-6 at 3:9–15], while Anderson testified that Plaintiff violated General Order 107 [Doc. 31-3 at 1:12–23]. With respect to Defendant's assertion that Plaintiff contacted Anderson numerous times between June 10 and 21, 2014, Defendant has failed to direct the Court to a rule prohibiting Plaintiff from contacting Anderson. Finally, with respect to Plaintiff's contacting Skipper on June 21, 2014, after Anderson told her they would all meet on Monday, June 23, 2014, whether Anderson ordered Plaintiff not to call Skipper is disputed. Plaintiff testified that when she asked Anderson if she should call Skipper, Anderson replied that they would talk on Monday but that he never directed Plaintiff not to call Skipper [Doc. 31-1 at 31:24–34:9], but Anderson testified that he told Plaintiff not to call

13

Skipper [Doc. 31-3 at 1:3–11]. Based on this evidence, a reasonable jury could conclude that Defendant's proferred reasons were not its real reasons for demoting Plaintiff. Further, a reasonable jury could conclude that Defendant's actual reason for demoting Plaintiff was to retaliate against her for her complaint about being treated differently and about the two-strikes comment.[5] Thus, summary judgment is not appropriate.[6]

## **RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Defendant's motion for summary judgment be DENIED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin  
United States Magistrate Judge

April 13, 2017  
Greenville, South Carolina

---

[5] Although Defendant is correct that the record indicates some form of discipline was contemplated before Anderson made the two-strikes comment, Defendant has failed to direct the Court to anything in the record to establish that the final decision regarding the specific discipline was made before June 23, 2014. Indeed, Anderson testified that he met with Skipper after the conversation with Plaintiff and that Anderson recommended that Plaintiff be terminated even though he had indicated to Plaintiff that he did not think she would be terminated. [Doc. 31-3 at 11:1–11.] A reasonable jury could conclude that the specific decision to demote Plaintiff was retaliatory.

[6] The undersigned declines to address at this posture Defendant's challenge to the admission of the audiotaped conversation between Hill and Plaintiff [Doc. 32 at 4–6] because even without considering this conversation, a question of fact exists with respect to Defendant's actual reason for demoting Plaintiff.